**IMPERIAL CASUALTY & INDEMNITY COMPANY, Plaintiff,**

v.

**HIGH CONCRETE STRUCTURES, INC., and United States Fidelity & Guaranty Company, Defendants,**

**and**

**High Steel Structures, Inc., d/b/a High Steel Service Center, Inc., Intervenor.**

**Civ. A. No. 86–3646.**

United States District Court, E.D. Pennsylvania.

Jan. 14, 1988.

Edward C. German, Philadelphia, Pa., for plaintiff.

Albert J. Schell, Jr., Philadelphia, Pa., for U.S. Fidelity.

Jack Sampson, Lancaster, Pa., for High Steel.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

In this action, two insurance companies seek declaratory judgment regarding their obligation to defend a state court action instituted by Keystone Stamping, Inc. ("Keystone") against High Steel Service Center, Inc. ("High Steel"). There being no material facts in dispute, summary judgment is appropriate.

## BACKGROUND

The relevant facts, which are not in dispute, may be summarized as follows. Plaintiff Imperial Casualty & Indemnity Company ("Imperial") issued policy No. AE30287 to High Concrete Structures, Inc. The Imperial policy provides professional liability coverage. There is no dispute that this policy was in effect at the time of the events underlying the Keystone suit.

Defendant United States Fidelity & Guaranty Company ("USF & G") issued policy No. MPO36926054 to High Industries, Inc., et al. The USF & G policy is a comprehensive general liability policy. There is no dispute that this policy was in effect at the time of the events underlying the Keystone suit.

Sometime after February, 1984, High Steel Structures, Inc., doing business under the registered fictitious name of High Steel Service Center, Inc., began to supply Keystone with hot rolled carbon steel. High Steel purchased large rolls of steel from Republic Steel Company.[1] High Steel then slit the rolls into widths of approximately three to four inches. No other change was made to the steel by High Steel before it

was shipped to Keystone. Keystone then stamped its product (washers) out of these rolls.[2] No other change was made to the steel by Keystone, which then shipped its product to Nice Bearing Products Division, SKF Industries, Inc. ("Nice"). Nice was to process the washers through a heat treatment, and expected to sell the processed washers to Chrysler Corporation for use in automobiles. However, the treatment process brought to the surface defects, inclusions, burrs, pitmarks and laminations which made the steel unacceptable for its intended use. Keystone brought a state court action asserting claims for breach of contract and breach of warranty. Keystone seeks damages for lost sales as a result of decreased production and cancelled orders, additional overtime costs, additional freight charges, and injury to reputation.

At all times relevant to this action, High Steel did not employ any metallurgical engineers or have any "in-house" metallurgical engineering capability. At the request of High Steel, Thomas C. Dudas, a metallurgical engineer employed by Republic Steel, had visited Keystone's plant, evaluated their needs and made recommendations to High Steel concerning the specifications of the steel to be provided to Keystone. High Steel relied on those recommendations, and on later recommendations by Dudas, in selecting the steel to be supplied to Keystone.

Before addressing the specific contentions of the parties, it is helpful to review the settled principles of insurance law which govern this action. As succinctly stated by the Third Circuit:

> Under Pennsylvania law, an insurance company is obligated to defend an insured whenever the complaint filed by the injured party may *potentially* come within the policy's coverage. The obligation to defend is determined solely by the allegations of the complaint in the

---

1. Through merger, Republic has since been succeeded by LTV Steel Company.

2. The washers, one of which was shown to the Court during oral argument, consist of rings of metal a fraction of an inch thick and approximately 2–3 inches in diameter. They are simply smaller pieces of the steel bars originally shipped by LTV.

action. The duty to defend remains with the insurer until the insurer can confine the claim to a recovery that is not within the scope of the policy.

In construing an insurance policy, if the words of the policy are clear and unambiguous, the court must give the words their plain and ordinary meaning. When a term in the policy is ambiguous, however, and the intention of the parties cannot be discerned from the face of the policy, the court, in its attempts to arrive at a reasonable construction of the policy that is in accord with the parties' apparent intention, may look to extrinsic evidence of the purpose of the insurance, its subject matter, the situation of the parties, and the circumstances surrounding the making of the contract. Where ambiguous, insurance contracts are to be construed strictly against the insurer. Hence, any ambiguities are to be resolved in favor of the insured. The language of a policy may not be tortured, however, to create ambiguities where none exist. Exclusions from coverage contained in an insurance policy will be effective against an insured if they are clearly worded and conspicuously displayed, irrespective of whether the insured read the limitations or understood their import.

*Pacific Indem. Co. v. Linn*, 766 F.2d 754, 760–61 (3d Cir.1985) (citations omitted).

## IMPERIAL POLICY

1. *High Steel Service Center, Inc. as a Named Insured.*

Imperial argues, first, that it has no obligation to defend the state court action because High Steel Service Center, Inc. is not a named insured under its policy.

The policy lists 11 named insureds, including 3 corporate entities and 8 individuals. One of the named insureds is High Steel Structures, Inc. High Steel Service Center, Inc. is a fictitious name under which High Steel Structures, Inc. is registered to do business.

The definition of "named insured" contained in the policy neither specifically includes nor excludes fictitious names. The Exclusion of Related Company Claims Endorsement specifically excludes from coverage "expenses arising out of claims ... by a business enterprise ... that ... is wholly or partly owned, operated or managed by the insured." However, the exclusion makes no specific reference to the situation in which the insured chooses to conduct part of its business under a fictitious name.

The Pennsylvania Fictitious Names Act, 54 Pa.C.S.A. § 301, *et seq.*, defines a fictitious name as "[a]ny assumed or fictitious name ... other than the proper name of the entity using such name." 54 Pa.C.S.A. § 302 (Purdon's Supp.1987). In addition to the mandatory registration provisions, any entity may voluntarily register a fictitious name "for the purpose of establishing a public record of their relationship to any business or other activity carried on under or through such fictitious name." 54 Pa.C.S.A. § 303(a). No entity which has failed to comply with the registration requirements of the statute may maintain an action in the courts of the Commonwealth until it has a) complied with the requirements of the statute, and b) paid a civil penalty of $500. 54 Pa.C.S.A. § 331. However, registration of the fictitious name "imparts no legal right to the registering entity other than that the conducting of business by it under a fictitious name shall not result in the penalties provided by section 331." 54 Pa.C.S.A. § 332(a). "The failure of any entity to register a fictitious name ... shall not impair the validity of any contract or act of such entity and shall not prevent such entity from defending any action in any tribunal of this Commonwealth." 54 Pa.C.S.A. § 331(a).

The Pennsylvania Fictitious Name Act does not, by its terms, provide a clear solution to the present issue. However, the statute does make clear that the corporate entity may, itself, be sued where it has done business under a fictitious name. Moreover, the corporate entity may bring suit to enforce contracts entered into under a fictitious name, provided the fictitious name is registered prior to the commencement of the suit. Thus, the statute recog-

**1142**

nizes that the rights and liabilities incurred under the fictitious name are the rights and liabilities of the corporate entity. So, too, the corporate entity bears responsibility for actions taken when doing business under a fictitious name.

▇ The present case does not present a situation involving two separate legal entities. High Steel Structures, Inc. and High Steel Service Center are one and the same. *See Kocher v. Kocher Estate,* 300 Pa. 206, 150 A. 468 (1930). Because the corporate and fictional entities are one and the same, the Exclusion of Related Company Claims Endorsement contained in the policy is clearly inapplicable.[3] Moreover, High Steel's fictitious name was registered pursuant to the statute, thereby giving Imperial constructive notice of the use of the fictitious name. The use of a fictitious name in no way impairs or affects the validity of any contract to which a corporation is a party. *W.F. Meyers Co., Inc. v. Stoddard,* 363 Pa.Super. 481, 486, 526 A.2d 446, 448 (1987). High Steel Structures cannot avoid liability for the contractual obligations entered into under its fictitious name. Nor may Imperial avoid its contractual obligation simply because High Steel Structures chose to conduct part of its business under a fictitious name. Rather, the policy explicitly provides that coverage is provided for acts or omissions "whether committed or alleged to have been committed by the Insured or any person employed by the Insured or *by others for whom the Insured is legally responsible.*" Imperial Policy, Insuring Agreements (I. Coverage —Professional Liability).

▇ In further support of its claim that High Steel Service is not a named insured, Imperial argues that the business activities of High Steel Service Center, Inc. are sepa-

rate and distinct from those of High Steel Structures. Imperial asserts that it issued a policy based on the application of the insured, which application described the insured's business as design and supervision of construction.[4] Imperial argues that High Steel Service's business involved the distribution of a product, rather than the rendering of professional services. Imperial contends that it would be unreasonable to assume that it intended this policy to extend to professional liability in connection with the production of rolled steel, and that, reading the policy as a whole, any ambiguity as to whether High Steel Service was a named insured should be resolved in its favor.

I disagree. The record clearly establishes that High Steel Services did more than simply act as the middleman in a chain of distribution. High Steel, acting on the recommendations of Thomas Dudas, determined the specifications of the steel to be provided to Keystone. Nor is the production of rolled steel so distinct from High Steel's other activities that it would be unreasonable to consider High Steel Service Center a named insured. If High Steel's activities are otherwise within the coverage of the policy, an issue which is addressed *infra,* Imperial may not avoid liability on the theory that High Steel Service Center is not a named insured.

2. *Whether the Allegations in the Keystone Complaint Potentially Come Within the Policy's Coverage.*

Imperial argues, next, that it is not obligated to provide a defense because the allegations in the Keystone complaint set forth a breach of a contract for the sale of goods and do not potentially come within

---

**3.** I note that even if the Exclusion of Related Company Claims Endorsement were to be construed to apply to fictional entities, it is by no means clear that this provision is applicable in the present context. A similar provision was recently construed as intended to prevent an insured from suing itself for professional errors committed while performing professional services for a business it owned or controlled. *Continental Cas. Co. v. Cole,* 809 F.2d 891, 896 (D.C.Cir.1987). This interpretation is supported

by the language of the exclusion, which refers to "[insurance] claims ... arising out of [liability] claims" by the wholly owned enterprise.

**4.** In fact, the application states that 30% of the insured's work concerns the design and supervision of construction, while 70% concerns "feasibility studies, surveys where applicant is not involved in design."

the coverage of Imperial's professional liability policy.

Imperial argues that its policy covers liability "arising out of any negligent act, error, mistake or omission in rendering or failing to render professional services of *the type described in the declarations,* whether committed or alleged to have been committed by the insured or any person employed by the insured or by others for whom the insured is legally responsible." Imperial Policy, Insuring Agreements (I. Coverage—Professional Liability). Imperial points out that the professional services listed on the Declarations page include "civil engineering, structural engineering, building design, bridge design, design of prestressed and precast structural components and concrete erection." Imperial argues that High Steel's activities in supplying steel to Keystone do not fall within the enumerated professional services and, therefore, there is no duty to defend this action.

High Steel asserts that, in determining the quality of metal to be supplied to Keystone, it relied on the professional expertise of LTV's metallurgical engineer, Thomas Dudas. Metallurgical engineering is, undoubtedly, a profession, but is not one listed on the declaration page of the policy. High Steel relies on Paragraph 9 of the Professional Activities Endorsement, which provides that "it is agreed that the terms 'professional services' and 'insured professional activity' shall include those professional services and professional activities as set forth in the Declarations of this Policy and *it is further agreed* that this Policy applies to the professional liability of the Named Insured arising from ... (9) The Named Insured's direct or contingent liability for faulty workmanship for work performed by or for the Named Insured." (emphasis added).

Resolution of this issue depends upon the interpretation of the Professional Activities Endorsement. Imperial asserts that "the clear intent of the Professional Activities Endorsement [is] that the insured [sic] only be liable for those enumerated activities which arise from professional liability of the insured which was spelled out on the Declarations Page."

██ I disagree. Reading the policy as a whole, it is clear that Paragraph 9 broadens the coverage of the policy. That paragraph, while defining the terms "Professional Service" and "Insured Professional Activity" to *include* the enumerated activities, does not exclude other activities from coverage. *Danyo v. Argonaut Ins. Companies,* 318 Pa.Super. 28, 31–32, 464 A.2d 501, 502 (1983). Indeed, the Professional Activities Endorsement explicitly expands the coverage far beyond the enumerated activities. Coverage includes, *inter alia,* professional liability "as a consultant or advisor ... on *all* aspects of planning for the mechanical phases of construction;" professional liability "for ... offering advice and making recommendations with respect to construction feasibility, time requirements for procurement, construction availability of materials and labor and possible economies in construction;" professional liability "arising out of work scheduling or coordination operations;" "liability for injuries to workmen of others arising out of the Named Insured's professional services;" and, most importantly, "direct or contingent liability for faulty workmanship for work performed by or for the Named Insured."

Clearly, policy coverage is not narrowly limited to the activities listed on the Declarations page. I also must reject Imperial's argument that the policy extends coverage only to liability arising from "construction related" activity. Although a number of the provisions of the Professional Activities Endorsement refer to construction activities, nowhere in the policy is coverage explicitly limited to such activities.

Although Keystone's cause of action against High Steel is the breach of a contract for the sale of goods, the focus must not be on the factual allegations underlying the complaint. *See Pacific Indem. Co. v. Linn,* 766 F.2d 754, 761 (3d Cir.1985) (question of whether the writing of diet book was a professional activity was not dispositive of insurer's duty to defend under professional liability policy). The bases of

Keystone's claims against High Steel are the alleged representation by High Steel that it could supply steel to meet Keystone's needs, and the choice of the steel which was provided. These actions by High Steel were, in turn, based on the professional activities of a metallurgical engineer. Although that engineer was not an employee of High Steel, the services were performed for the Named Insured. Metallurgical engineering is a professional activity not specifically excluded from coverage under the policy. To the extent that the policy is ambiguous as to coverage, it must be construed against the insurer. *Gene & Harvey Builders Inc. v. Pennsylvania Mfrs Ass'n Ins. Co.*, 512 Pa. 420, 426, 517 A.2d 910, 913 (1986).

Therefore, I conclude that Imperial Casualty & Indemnity Co. owes a duty of defense to High Steel Service Center in the underlying actions.

### 3. *Attorney fees and costs.*

■ Under Pennsylvania law, "a court may award attorney's fees and costs incurred in bringing an action to establish the duties to defend ... where the insurer's refusal to defend is unreasonable and in bad faith." *Pacific Indem. Co. v. Linn*, 766 F.2d 754, 769 (3d Cir.1985); *Kelmo Enterprises, Inc. v. Commercial Union Ins. Co.*, 285 Pa.Super. 13, 24, 426 A.2d 680, 685 (1981). Although I believe it is clear that Imperial has a duty to defend the underlying action, the arguments raised by Imperial against that conclusion were not frivolous. Therefore, I decline to award attorney's fees.

### USF & G

United States Fidelity & Guaranty argues that it is not obligated to provide a defense to High Steel because there has been no "property damage" or "occurrence" as defined in the policy and because there are applicable exclusions.

The USF & G comprehensive general liability policy issued to High Steel provided coverage for damages incurred because of "property damage" or "bodily injury" caused by an "occurrence."

An "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured."

"Property damage" is defined as

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or

(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

USF & G's duty to defend this suit turns on the question of whether there is damage to tangible property other than the product of the insured.[5]

Although this issue has been addressed by a number of courts, no court appears to have addressed the unusual situation presented by this case. The products produced by Republic Steel, High Steel, and Keystone differ only in the shape and size of the piece of metal. High Steel's product no longer existed, except in the form of the washer; the washer had no substance except for the steel provided by High Steel. Physical injury to one was, necessarily, physical injury to the other.

■ Other cases addressing the issue of what constitutes "property damage" for the purposes of similar policies support the conclusion that, under the facts of this case, there is property damage within the meaning of the policy.

In *Hamilton Die Cast, Inc. v. United States Fidelity & Guaranty Co.*, 508 F.2d 417 (7th Cir.1975), the Seventh Circuit held

---

**5.** Property damage does not include the defective product of the insured. *Hamilton Die Cast, Inc. v. United States Fidelity & Guaranty Co.*, 508 F.2d 417 (7th Cir.1975); *Young v. United States Fidelity & Guaranty Co.*, C.A. No. 86–6822, slip op. at 3 (E.D.Pa. July 22, 1987) (Giles, J.) [Available on WESTLAW, 1987 WL 14846].

that there was no property damage to the finished product, a tennis racket, by reason of the incorporation of a defective frame. The court reasoned:

> We do not think that the mere inclusion of a defective component, where no physical harm to the other parts results therefrom, constitutes "property damage" within the meaning of the policy. For example, if an automobile crash results from the failure of its defective tire, the defective component can be said to have caused "property damage" to the finished product. If, however, some of the tires purchased by the automobile manufacturer are found to be defective and the manufacturer therefore withdraws its cars from the market, there has not been "injury to or destruction of tangible property."

508 F.2d at 419–20.

In contrast, the use of High Steel's product resulted in physical damage to the washers made from it. The washers were, in their entirety, rendered defective. Indeed, the present case is analogous to the defective automobile. The washers, once manufactured, could not simply be removed from the final product and replaced.[6]

In *Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co. of N.Y.*, 281 F.2d 538 (3d Cir.1960), the Third Circuit held that once defective paint had been baked onto the steel and aluminum parts of venetian blinds, "the paint is no longer identifiable as a separate entity but is intended to and does become a part of the finished product. Thereafter, any damage to the finished product ... is property damage covered by the liability insurance policies [of the manufacturer.]" 281 F.2d at 541. I find that *Pittsburgh Plate Glass* is controlling in the present case, and compels the conclusion

that damage to Keystone's washers constitutes property damage within the meaning of the policy. *See also, Puritan Insurance Co. v. Aldan Rubber Co.*, C.A. 86–2937, slip op. (E.D.Pa. Nov. 10, 1986) [Available on WESTLAW, 1986 WL 12774], *vacated and remanded*, 829 F.2d 32 (3d Cir. 1987). *Cf., Environmental Tectonics Corp. v. Travenol Laboratories, Inc.*, C.A. 84–1412 (E.D.Pa. June 24, 1986) [Available on WESTLAW, 1986 WL 7211] (where damaged vessels retained their separate identity and were not incorporated into another product, the property damage is only to the product of the insured).

Recently, the Seventh Circuit considered a case in which defective steel joists were used in a construction project. When the concrete floor was poured, the joists buckled, compromising the integrity of the building and compelling plaintiffs to undertake extensive remedial measures. In holding that the insurer had a duty to defend the suit, the court emphasized that the building was already in existence, separate and apart from the work product of the insured.[7] *Ohio Casualty Ins. Co. v. Bazzi Construction Co.*, 815 F.2d 1146 (7th Cir.1987).

*Firemen's Ins. Co. v. Bauer Dental Studio, Inc.*, 805 F.2d 324 (8th Cir.1986) also provides some guidance. The Eighth Circuit found property damage to a composite product distinct from the work product of the manufacturer of a dental crown. The dentist's work in grinding, polishing, and inserting the crown into the patient's mouth altered the product to a sufficient extent to lead the court to conclude that damage to the implanted crown was not merely damage to the product of the insured.

The additional work performed by Keystone in designing its product and stamping

---

**6.** I note that the Seventh Circuit's ultimate conclusion in favor of the insurer in *Hamilton Die* has been questioned by the Third Circuit. *McDowell–Wellman Engineering Co. v. Hartford Accident & Indemnity Co.*, 711 F.2d 521, 525 n. 7 (3d Cir.1983).

**7.** The court contrasted the situation in which the insured was responsible for the construction of the entire building, so that the building was

the work product of the insured. In such a situation, damage to part of the building would not be "property damage" within the meaning of the policy. *See, Gene & Harvey Builders, Inc. v. Pennsylvania Manufacturers' Assn. Insurance Co.*, 512 Pa. 420, 517 A.2d 910 (1986) and *Young v. United States Fidelity & Guaranty Co.*, C.A. 86–6832 (E.D.Pa. July 22, 1987).

it out of the larger metal pieces supplied by High Steel produced a far more significant change in the product than did the dentist's work in *Bauer.* USF & G may not seek to be insulated from coverage by the mere chance that, in processing the product, Keystone did not combine it with other materials.

The reasoning of these cases, taken together, persuades me that if washers were actually stamped out of the metal sheets supplied by High Steel, and were found to be defective, such damage was property damage within the meaning of the policy. However, this does not end the analysis. USF & G's obligation to defend must be determined solely by the allegations of the complaint in the underlying action. Careful examination of that complaint reveals that Keystone seeks to recover for the reduced revenues and increased costs it suffered as a result of High Steel's failure to provide an adequate product. Specifically, Keystone seeks damages for 1) sales lost as a result of orders cancelled by Nice; 2) sales lost as a result of a decrease in production of washers; 3) increased overtime incurred in an attempt to increase production; 4) increased freight costs incurred in establishing an alternate source; 5) loss of reputation. The complaint contains no specific claim for property damage to Keystone's product.

■ By Order of November 16, 1987, I suggested to counsel that the only damages claimed by Keystone resulted not from damage to Keystone's washers, but from the fact that Keystone could not manufacture washers from the steel supplied by High Steel and was forced to find an alternate source of supply. I solicited the comments of counsel on this matter. After careful consideration of the supplemental memoranda submitted to me, I am persuaded that the underlying complaint does not assert a claim for damages arising out of injury to Keystone's product. Rather, Keystone claims damages incurred as a result of the loss of the use of High Steel's product. These loss-of-use damages are not covered by the USF & G policy. *McDowell–Wellman Engineering v. Hartford Accident & Indemnity Co.*, 711 F.2d 521, 527 (3d Cir.1983).[8]

For this reason, I conclude that USF & G is not obligated to defend High Steel against the Keystone claims.

An appropriate order is attached.

### MEMORANDUM AND ORDER

Upon consideration of the motion for summary judgment of defendant United States Fidelity & Guaranty Company, the cross-motion for summary judgment of plaintiff Imperial Casualty & Indemnity Company, the cross-motion for summary judgment of defendant High Concrete Structures, Inc. and intervenor High Steel Structures, Inc. (collectively, "High Steel"), the memoranda and supplemental memoranda submitted by the parties, the stipulation of facts, and the comments of counsel during oral argument, and for the reasons stated in the attached memorandum, IT IS ORDERED that:

1. Judgment is entered in favor of defendant High Steel and against plaintiff Imperial Casualty & Indemnity on Imperial policy No. AE30287. Imperial owes a duty of defense to High Steel in the underlying action brought by Keystone Stamping, Inc.

2. Judgment is entered in favor of defendant United States Fidelity & Guaranty and against defendant High Steel on USF & G policy No. MPO36926054. USF & G does not owe a duty of defense to High Steel in the underlying action brought by Keystone Stamping, Inc.

3. High Steel's request for attorney fees and costs is denied.

IT IS SO ORDERED.

---

8. This conclusion is further supported by exclusion (p), which precludes coverage for damages resulting from the withdrawal, inspection, repair, replacement or loss of use of the Named Insured's products if such products are withdrawn from the market because of any known or suspected deficiency therein.