858 F.2d 128
 IMPERIAL CASUALTY AND INDEMNITY COMPANY, Appellant No. 88-1075
v.
HIGH CONCRETE STRUCTURES, INC. and United States Fidelity &
Guaranty Company High Steel Structures, Inc. d/b/a
High Steel Service Center, Inc., Intervenor.
IMPERIAL CASUALTY AND INDEMNITY COMPANY
v.
HIGH CONCRETE STRUCTURES, INC. and United States Fidelity &
Guaranty Company High Steel Structures, Inc. d/b/a
High Steel Service Center, Inc., Intervenor.
Appeal of HIGH CONCRETE STRUCTURES, INC., Defendant and High
Steel Structures, Inc., d/b/a High Steel Service
Center, Inc., Intervenor.
IMPERIAL CASUALTY AND INDEMNITY COMPANY
v.
HIGH CONCRETE STRUCTURES, INC. and United States Fidelity &
Guaranty Company High Steel Structures, Inc. d/b/a
High Steel Service Center, Inc., Intervenor.
Appeal of UNITED STATES FIDELITY & GUARANTY COMPANY.
 Nos. 88-1075, 88-1085 and 88-1108.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 17, 1988.
Decided Sept. 26, 1988.
Rehearing and Rehearing In Banc Denied Nov. 3, 1988.
 
 June E. Gilson (argued), German, Gallagher & Murtagh, Philadelphia, Pa., for Imperial Cas. & Indem. Co.
 John L. Sampson (argued), Matthew G. Guntharp (argued), Lancaster, Pa., for High Concrete Structures, Inc., High Steel Structures, Inc., d/b/a High Steel Service Center, Inc.
 Albert J. Schell, Jr., Allan C. Molotsky (argued), Post & Schell, Philadelphia, Pa., for U.S. Fidelity & Guar. Co.
 Before STAPLETON and MANSMANN, Circuit Judges, and FISHER, District Judge*.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 Having been sued in state court for breach of warranty, High Steel Structures, Inc. trading as High Steel Service Center, Inc. tendered the defense of the action to Imperial Casualty & Indemnity Co. ("Imperial"), which had issued it a professional liability policy, and to United States Fidelity & Guaranty Co. ("USF & G"), which had issued it a comprehensive general liability policy. Both Imperial and USF & G declined to provide a defense, and Imperial subsequently brought this declaratory judgment action requesting a finding that it had no duty to defend and that USF & G did have a duty to defend. The district court held against Imperial as to the duties of both insurers, 678 F.Supp. 1138; we will reverse as to the duties of both insurers.
 
 I.
 
 2
 Imperial issued an architects, engineers, and construction managers professional liability insurance policy to High Concrete Structures, Inc. for the period October 22, 1984 to October 22, 1985. High Steel Structures, Inc. was also listed as a named insured in the Imperial policy. High Steel Service Center, Inc. is a fictitious name used by High Steel Structures in conducting part of its business.
 
 
 3
 USF & G issued a comprehensive general liability insurance policy to High Industries, Inc. for the period December 1, 1983 to December 1, 1986. Also listed as named insureds were High Concrete Structures, Inc. and High Steel Structures, Inc. t/a High Steel Service Center, Inc. High Concrete Structures and High Steel Structures are subsidiaries of High Industries.
 
 
 4
 The suit underlying this declaratory judgment action is a breach of warranty action instituted by Keystone Stampings, Inc., in the Lancaster County Court of Common Pleas. The material facts leading up to that suit, which are not in dispute, are as follows. Keystone is a manufacturer of, among other things, steel washers. High Steel Service Center is a distributor of carbon sheet steel. In need of some high-quality steel from which to make washers that would be heat-treated and used in the manufacture of automobiles, Keystone contacted High Steel Service Center. Because High Steel Service Center, as it explains, "had no in-house metallurgical engineering capability," it contacted Republic Steel Co., now LTV Corp., to see if Republic/LTV could supply the necessary steel. A metallurgical engineer from Republic/LTV, Thomas Dudas, met with representatives of High Steel Service Center and Keystone to discuss and arrange the deal.
 
 
 5
 All parties to the discussions knew the treatment the washers would have to go through and the ultimate function the washers would perform; it was agreed that the washers had to be made out of steel with excellent surface quality. Dudas advised that a certain manufacturing process was called for, and said that Republic/LTV could supply steel made using this process. Dudas told High Steel Service Center that in ordering this steel from Republic/LTV, it should mark its purchase orders to Republic/LTV in a certain way, so as to alert Republic/LTV to use the manufacturing process Dudas had determined was necessary. High Steel Service Center then agreed to supply Keystone with the quantity and quality of steel Keystone needed for its washers.
 
 
 6
 Republic/LTV manufactured the steel in accordance with the purchase orders it received from High Steel Service Center, which were marked as Dudas had advised. Republic/LTV shipped the steel in rolls 45" wide to High Steel Service Center, which slit the rolls into strips 3-4" in width and sent them along to Keystone.[1] Keystone stamped its washers out and sent them to Nice Bearing Products, which was to heat-treat the washers and send them along to Chrysler. When Nice heat-treated the washers, however, their surfaces developed pitts, burrs, and other defects. Nice thereupon rejected Keystone's washers as unsuitable for their intended use. Keystone sued High Steel Service Center for breach of warranty, alleging that its washers were defective because the steel supplied by High Steel Service Center was defective. Damages claimed by Keystone included loss of profits (from reduced production and from cancelled orders), incidental expenses (mainly extra freight charges incurred in purchasing replacement steel), and loss of reputation.
 
 
 7
 According to High Concrete and High Steel Structures, the reason for the failure of the steel was that the manufacturing process recommended by Dudas was not correct. This explanation, which is not disputed by Imperial, is supported by the report of a Republic/LTV investigating engineer which says that an entirely different manufacturing process should have been used to produce steel of the type needed by Keystone.
 
 
 8
 As noted, both insurers denied coverage. Imperial's bases for denial were that High Steel Service Center was not an insured under its policy and that the policy did not cover this type of claim. USF & G denied coverage on various grounds, most importantly for the reason that there had been no "property damage" within the meaning of the policy.
 
 
 9
 Imperial filed this action for a declaratory judgment, arguing that it did not have to defend the action and USF & G did. High Concrete counterclaimed, seeking a declaration that Imperial had to defend and an award of attorney's fees and costs incurred in defending both the state court suit and this federal court suit. High Steel Structures intervened, joining forces with High Concrete. USF & G filed an answer and counterclaim, requesting a determination that it did not have to defend and that Imperial did. The parties filed cross-motions for summary judgment.
 
 
 10
 The district court ruled that Imperial did owe a duty to defend, that USF & G did not, and that High Concrete and High Steel Structures were not entitled to recover from Imperial the attorney's fees and costs incurred in the federal action. Imperial appeals, contending that it does not have a duty to defend and USF & G does; High Concrete and High Steel Structures appeal, contending that USF & G has a duty to defend.[2] USF & G has filed a notice of appeal purporting to appeal "from that portion of the district court's opinion finding property damages under the terms of the policy." App. at 434. The parties' arguments on appeal concerning proper construction of the two policies are essentially the same as the arguments made before the district court.[3]
 
 
 11
 We have jurisdiction pursuant to 28 U.S.C. Sec. 1291, and because the material facts are not in dispute, our review of the district court's determination of the proper coverage of the insurance contracts at issue is plenary. Pacific Indemnity Co. v. Linn, 766 F.2d 754, 760 (3d Cir.1985). We are guided in our review by the well-settled principles governing the interpretation of insurance policies under Pennsylvania law, which include the following: if the language of an insurance policy is clear and unambiguous, its ordinary meaning is to be given effect; policy terms should be read to avoid ambiguities; a provision is ambiguous if reasonable persons on considering it in the context of the entire policy could honestly differ as to its meaning; if ambiguities do exist in the wording chosen by the insurance company, they must be resolved in favor of the insured;[4] a court cannot rewrite the terms of a policy or give them a construction in conflict with the accepted and plain meaning of the language of the policy. See, e.g., St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co., 655 F.2d 521, 524 (3d Cir.1981); Pacific Indemnity Co. v. Linn, 766 F.2d at 760-61; Northbrook Ins. Co. v. Kuljian Corp., 690 F.2d 368, 372 (3d Cir.1982); Houghton v. American Guar. Life Ins. Co., 692 F.2d 289, 291 (3d Cir.1982). The specific rules with respect to determination of a duty to defend are stated in Pacific Indemnity Co. v. Linn:
 
 
 12
 Under Pennsylvania law, an insurance company is obligated to defend an insured whenever the complaint filed by the injured party may potentially come within the policy's coverage.... The obligation to defend is determined solely by the allegations of the complaint in the action.... The duty to defend remains with the insurer until the insurer can confine the claim to a recovery that is not within the scope of the policy.
 
 
 13
 766 F.2d at 760 (citations omitted) (emphasis in original).
 
 II.
 
 14
 Imperial makes two arguments as to why its policy does not require it to provide a defense: first, that High Steel Service Center is not an insured under the policy; and second, that the activities sued over are not within the scope of the policy's coverage. We agree with the district court that the first of these arguments lacks merit. High Steel Structures is named as an insured on the Imperial policy; the Keystone complaint alleges liability based on business activity engaged in by High Steel Structures; and High Steel Structures will have to pay if liability is established. It is irrelevant that High Steel Structures chose to conduct part of its business activities under a fictitious name.[5]
 
 
 15
 Imperial's contention that High Steel Service Center's activities are significantly unlike the covered activities of High Steel Structures is immaterial to determination of the identity of the named insureds. This contention bears on the issue of whether the activities forming the basis alleged for liability are within the scope of coverage, and should be addressed in connection with that issue. If High Steel Service Center's activities do come within the policy's scope of coverage, then they are similar enough to High Steel Structures' covered activities to require that High Steel Service Center, which is just another name for a named insured, be considered a named insured. If High Steel Service Center's activities do not come within the policy's scope of coverage, then that is the ground on which coverage may be denied, not the ground that High Steel Service Center is not separately named as an insured.
 
 
 16
 We agree with Imperial, however, that the activities sued over by Keystone do not fall within the scope of the Imperial policy's coverage. As reflected in its caption and text, the Imperial policy is an "Architects, Engineers, and Construction Managers Professional Liability Insurance Policy." High Steel Structures, according to the Imperial policy's declarations, engages in "Civil Engineering, Structural Engineering, Building Design, Bridge Design, Design of Prestressed and Precast Structural Components and Concrete Erection." The paragraph defining the scope of coverage expressly limits coverage to claims arising out of rendering or failing to render "professional services of the type described in the Declarations." Thus, if the professional services of Dudas, which according to High Steel are the cause of the possible liability to Keystone, are not of the type described in the declarations, then these claims do not potentially come within the scope of coverage spelled out in the body of the policy and there is no duty to defend thereunder. As the district court correctly stated, "[m]etallurgical engineering is, undoubtedly, a profession, but [it] is not one listed on the declaration page of the policy." 678 F.Supp. at 1143. We, like the district court, do not think it would be reasonable to read the body of the policy as potentially providing coverage under these circumstances.
 
 
 17
 Unlike the district court, we do not think Endorsement # 5, the Professional Activities Endorsement, broadens the scope of coverage to include this situation. This endorsement provides that:
 
 
 18
 It is agreed that the terms "Professional Services" and "Insured Professional Activity" shall include those professional services and professional activities as set forth in the Declarations of this Policy and it is further agreed that this Policy applies to the professional liability of the Named Insured arising from:
 
 
 19
 1. Design errors.
 
 
 20
 2. Professional liability as a consultant or advisor to the Owner or Architect-Engineer on all aspects of planning for the mechanical phases of construction.
 
 
 21
 3. Professional liability for reviewing plans or specifications and offering advice or making recommendations with respect to construction feasibility, time requirements for procurement, construction availability of materials and labor and possible economies in construction.
 
 
 22
 4. Design error in work completed by the Architect-Engineer for the Named Insured.
 
 
 23
 5. Professional liability for the supervisory, inspection or review services performed by the Named Insured for the Architect-Engineer or Owner.
 
 
 24
 6. The Named Insured's direct or contingent liability arising from awarding of contracts to others by the Named Insured on behalf of the Owner.
 
 
 25
 7. The Named Insured's direct or contingent liability arising out of work scheduling or coordination operations.
 
 
 26
 8. The Named Insured's direct or contingent liability for injuries to workmen of others arising out of the Named Insured's professional services.
 
 
 27
 9. The Named Insured's direct or contingent liability for faulty workmanship for work performed by or for the Named Insured.
 
 
 28
 10. The Named Insured's direct or contingent liability to the public for work performed by the Named Insured on behalf of the Named Insured arising out of the Named Insured's professional services.
 
 
 29
 App. at 16. The district court predicated Imperial's duty to defend on clause 9 of this endorsement. 678 F.Supp. at 1143. In our view, neither clause 9 in context nor any of the other listed activities are implicated here because, while awkwardly worded, they all clearly relate to construction and Keystone's claim is clearly unrelated to construction.
 
 
 30
 This professional liability policy, drafted with intent to cover the professional liabilities of architects, engineers, and construction managers, is based upon declarations stating that the insureds' activities involved design and engineering work done in conjunction with the construction by others of a variety of structures.[6] Endorsement # 5 clearly addresses the potential liability of the insureds arising through the various stages of construction: design and planning of construction, review of specifications, awarding of contracts, work scheduling, work by workmen of others who risk being injured, faulty workmanship, and liability to the public. While this endorsement clarifies and broadens the kinds of construction-related activity that are covered by the policy, it cannot fairly be read in context as an undertaking to insure product liability having nothing to do with construction.
 
 
 31
 The district court was able to find coverage only by taking one clause of this endorsement out of context. The result of its effort was a transformation of this professional liability policy into the equivalent of a comprehensive general liability policy. While an insurance policy must be construed in favor of coverage, it need not and should not be twisted out of shape. See Harbor Ins. Co. v. Lewis, 562 F.Supp. 800, 805 (E.D.Pa.1983) (applying Pennsylvania law) ("[A] party cannot lift one clause out of an insurance contract and attach a meaning to it considered in isolation."); Treasure Craft Jewelers, Inc. v. Jefferson Ins. Co. of New York, 431 F.Supp. 1160, 1164 (same), aff'd, 583 F.2d 650 (3d Cir.1978). We find Endorsement # 5 inapplicable here, and will therefore reverse the district court's holding that Imperial is obliged to defend the Keystone suit.
 
 III.
 
 32
 USF & G contends that the district court erred in finding that there was damage to property other than the insured's own product, which would fall within exclusion (n). USF & G also argues that exclusions (m), (o), and (p) apply to preclude coverage.[7] High Steel, supported by Imperial, contends that the district court erred in finding that the damages sought by Keystone are not potentially covered by the USF & G policy because they would constitute compensation for loss of use rather than for property damage.
 
 A. Property damage
 
 33
 USF & G agreed to "pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of: A. bodily injury [or] B. property damage to which the insurance applies, caused by an occurrence." App. at 192. "Property damage" is defined as:
 
 
 34
 (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or
 
 
 35
 (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
 
 
 36
 App. at 141.
 
 
 37
 The theory advanced by High Steel and Imperial, with which the district court agreed, is that the damage to the washers is "property damage" caused by an "occurrence," i.e. the heat treatment by Nice. USF & G does not dispute that the heat treatment was an "occurrence" and does not deny that the washers were physically injured, but challenges the assertion that the heat treatment caused "property damage" to property other than the insured's own product. Accordingly, USF & G relies upon exclusion (n), which provides that the policy does not apply:
 
 
 38
 (n) to property damage to the Named Insured's products arising out of such products or any part of such products.
 
 
 39
 App. at 71.
 
 
 40
 We agree with the district court that Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co. of New York, 281 F.2d 538 (3d Cir.1960) (applying Pennsylvania law) is indistinguishable and "compels the conclusion that damage to Keystone's washers constitutes property damage within the meaning of the policy." 678 F.Supp. at 1145. In Pittsburgh Plate Glass, the court held that after paint had been baked onto venetian blinds, the paint was part of a different product, and, accordingly, that the flaking and peeling of the paint constituted damage to other property rather than damage to the insured paint manufacturer's own property. 281 F.2d at 541. In this case, High Steel's steel was changed by being cut and shaped into beveled washers just as the paint in Pittsburgh Plate Glass was changed by being baked onto venetian blinds. In each instance, the purchaser created a new product having a value in excess of the value of the product supplied by the insured, and suffered damage to more than just the insured's product. See also Firemen's Ins. Co. of Newark v. Bauer Dental Studio, Inc., 805 F.2d 324, 325 (8th Cir.1986) (finding that damage to a crown that had been ground, drilled, and installed in a patient's mouth was not damage to the property of the insured crown manufacturer within the meaning of the exclusion for damage to the insured's own property).
 
 
 41
 We find the cases cited by USF & G distinguishable on the ground that the product in those cases was not made into something else and therefore damaged only itself by reason of its defective nature. For example, in Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co., 512 Pa. 420, 517 A.2d 910, 914 (1986), the only Pennsylvania case on the issue cited by USF & G, a contractor was sued by purchasers of a home that the contractor had allegedly constructed negligently and in an unworkmanlike manner. The contractor was held not entitled to comprehensive general liability coverage. Because the insured contractor was responsible for constructing the entire home, the home necessarily had to be considered the insured's own product. The claim thus fell within the standard work product exclusions, (n) and (o) in the case of the USF & G policy. Similarly, in Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 405 A.2d 788, 405 A.2d 788 (1979), a masonry company was sued by customers who had had to replace stucco that had been faultily installed by the company. Because the faulty work by the masonry company was not alleged to have caused any property damage to property other than the work product of or materials supplied by the insured, the masonry company was held not entitled to coverage due to the work product exclusions in the masonry company's policy. See also Century I Joint Venture v. USF & G, 63 Md.App. 545, 493 A.2d 370, 376 (1985) (no coverage where condominium developers were sued for faulty design and construction by condominium purchasers, as there was no damage to property other than the building itself), cert. denied, 304 Md. 297, 498 A.2d 1183 (Md.1985); cf. Ohio Cas. Ins. Co. v. Bazzi Constr. Co., 815 F.2d 1146, 1148-49 (7th Cir.1987) (holding that property damage had occurred where new construction damaged an existing garage; but if an entirely new structure had been built, the work product exclusions would have precluded coverage since the damage would have been limited to the work product of the insured).
 
 B. Loss of use
 
 42
 The district court held in USF & G's favor despite its finding that there had been damage to property other than High Steel's own product because it found that the underlying action did not assert a claim for damages arising out of injury to Keystone's product but rather claimed "damages incurred as a result of the loss of the use of High Steel's product." Reviewing the allegations of the complaint, the court concluded that:
 
 
 43
 Keystone seeks to recover for the reduced revenues and increased costs it suffered as a result of High Steel's failure to provide an adequate product. Specifically, Keystone seeks damages for 1) sales lost as a result of orders cancelled by Nice; 2) sales lost as a result of a decrease in production of washers; 3) increased overtime incurred in an attempt to increase production; 4) increased freight costs incurred in establishing an alternate source; 5) loss of reputation. The complaint contains no specific claim for property damage to Keystone's product.... Rather, Keystone claims damages incurred as a result of the loss of the use of High Steel's product. These loss of use damages are not covered by the USF & G policy.
 
 
 44
 678 F.Supp. at 1146.
 
 
 45
 We hold that the district court erred in concluding that liability for these damages is not potentially covered by the USF & G policy. The USF & G policy coverage extends to sums the insureds become legally responsible to pay as "damages because of ... property damage to which the insurance applies, caused by an occurrence." Loss of use damages caused by property damage are not excluded. To the contrary, paragraph (1) of the definition of "property damage" specifically includes liability for the loss of use of damaged tangible property if the loss of use results from the damage. Thus, if there is property damage, then there is coverage for any loss of use the damage caused. Because we have found that property damage to Keystone's washers would be covered, and because the Keystone complaint clearly alleges the requisite causal link between the covered property damage and the other damages including loss of use, the potential for USF & G coverage is present.[8]
 
 C. Exclusions (m), (o), and (p)
 
 46
 USF & G contends that exclusions (m), (o), and (p) apply as well as (n); in light of its conclusion with regard to loss of use, the district court did not discuss these other exclusions. We do not find any of them to preclude coverage under the circumstances of this case.
 
 1. Exclusion (m)
 
 47
 This exclusion provides that the policy does not apply:
 
 
 48
 to loss of use of tangible property which has not been physically injured or destroyed resulting from
 
 
 49
 (1) a delay in or lack or performance by or on behalf of the Named Insured of any contract or agreement, or
 
 
 50
 (2) the failure of the Named Insured's products or work performed by or on behalf of the Named Insured to meet the level of performance, quality, fitness or durability warranted or represented by the Named Insured;
 
 
 51
 but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the Named Insured's products or work performed by or on behalf of the Named Insured after such products or work have been put to use by any person or organization other than an Insured.
 
 
 52
 App. at 71. Because the washers were physically injured, this exclusion is on its face inapplicable.
 
 2. Exclusion (o)
 
 53
 This exclusion provides that the policy does not apply:
 
 
 54
 to property damage to work performed by or on behalf of the Named Insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.
 
 
 55
 App. at 71. As noted above, this exclusion is a counterpart of (n), which we have found inapplicable here. We find (o) also inapplicable for essentially the same reasons: because Keystone's damaged product is not the same as High Steel's product, the relevant damage is not to High Steel's own product (exclusion (n)) or to work performed by or on its behalf (exclusion (o)).
 
 3. Exclusion (p)
 
 56
 This exclusion, called the "sistership" exclusion because it applies where products are recalled because of known defects in their sister products,[9] provides that the policy does not apply:to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the Named Insured's products or work completed by or for the named Insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.
 
 
 57
 App. at 193. The product to look to, according to the explicit terms of this exclusion, is that sold by High Steel. Because the damages claimed by Keystone have nothing to do with a "withdraw[al] from the market or from use" of High Steel's steel, exclusion (p) is not applicable in this case.
 
 IV.
 
 58
 For the foregoing reasons, we reverse the judgment of the district court and remand with instructions to enter a summary judgment declaring that Imperial has no duty to defend High Steel in the underlying suit and that USF & G does have such a duty.
 
 
 
 *
 Honorable Clarkson S. Fisher, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 These events took place in the early months of 1984; it is not disputed that both the Imperial and USF & G policies were in effect at the time
 
 
 [2]
 Although High Concrete and High Steel Structures do not contend on appeal that they are entitled to the federal court fees and costs, they continue to press their argument that they should receive the state court fees and costs. The district court, however, did not hold that High Concrete and High Steel Structures were not entitled to the state court fees and costs; denial of the state court fees and costs would be inconsistent with the holding that there was a duty to defend. If an insurer has a duty to defend a suit and is requested to provide a defense, then that insurer is clearly obligated to pay fees and costs incurred by the insured in defending the suit. See, e.g., Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co. of New York, 281 F.2d 538, 542 (3d Cir.1960); J. Appleman, 7C Insurance Law & Practice Sec. 4691 at 240 (Berdal ed. 1979). Thus, if Imperial or USF & G has a duty to defend, it must reimburse High Concrete and High Steel Structures for the state court fees and costs the insureds have paid in defending the Keystone suit
 
 
 [3]
 In addition, the parties make various claims of waiver, all of which we find meritless
 
 
 [4]
 USF & G argues that the principle that ambiguities should be construed in favor of the insured does not apply here since the insured is not technically a plaintiff suing USF & G for coverage. Appellee-Cross Appellant's Brief at 20-21. However, Pennsylvania law says not only that insurance policies must be construed in favor of the insured, but also that policies must be construed "in a manner which is more favorable to coverage." Houghton v. American Guar. Life Ins. Co., 692 F.2d 289, 291 (3d Cir.1982) (citing Pennsylvania cases). High Steel Structures did tender the defense of the Keystone action to USF & G and was refused, and is in the thick of the litigation demanding USF & G coverage; if USF & G prevails, High Steel Structures will not get coverage from USF & G. USF & G is being disingenuous, to say the least, in making this argument, and any ambiguities in its policy will be construed against it
 
 
 [5]
 The district court found that,
 High Steel Structures cannot avoid liability for the contractual obligations entered into under its fictitious name. Nor may Imperial avoid its contractual obligation simply because High Steel Structures chose to conduct part of its business under a fictitious name. Rather, the policy explicitly provides that coverage is provided for acts or omissions "whether committed or alleged to have been committed by the Insured or any person employed by the insured or by others for whom the Insured is legally responsible."
 
 
 [678]
 F.Supp. at 1142 (emphasis in original). Imperial does not contend that High Steel Structures is not legally responsible for the business it does under the name High Steel Service Center
 
 
 [6]
 The declarations, in turn, are based upon the insureds' application for professional liability insurance; the policy explicitly states that
 By acceptance of this Policy, all Insureds agree that the statements in the application are their agreements, representations and warranties that this Policy is issued in reliance upon the truth thereof....
 App. at 43. The district court noted that High Steel Structures' application "states that 30% of the insured's work concerns the design and supervision of construction, while 70% concerns 'feasibility studies, surveys where applicant is not involved in design.' " 678 F.Supp. at 1142 n. 4.
 
 
 [7]
 Another argument pressed by USF & G is that because Pennsylvania law does not permit a person complaining of only injury to the defective product itself to recover in tort, and only contract remedies are available against High Steel, tort-oriented comprehensive general liability insurance "is not available to protect High Steel." Appellee-Cross Appellant's Brief at 26-28. What is at issue here, however, is not the distinction between tort and contract liability but a specific insurance contract that must be interpreted according to well-established rules of construction
 
 
 [8]
 We note that McDowell-Wellman Eng'g Co. v. Hartford Accident & Indemnity Co., 711 F.2d 521, 525-27 (3d Cir.1983), upon which the district court relied, is distinguishable because in that case there was no physical injury to property other than the insured's own property. For a helpful discussion of this issue, see Note, Liability Coverage for "Damages Because of Property Damage" Under the Comprehensive General Liability Policy, 68 Minn.L.Rev. 795 (1984)
 
 
 [9]
 When a product is withdrawn because of defective performance, a "sistership" provision excludes coverage for costs incurred when a related, "sister" product is also withdrawn because its relationship to the defective product renders its quality suspect. Sistership provisions are not intended to exclude from coverage damages arising from the withdrawal of the product that raised suspicions. A fortiori, they do not exclude coverage of damages arising from a defective product when no sister products are involved. See Todd Shipyards Corp. v. Turbine Service, Inc., 674 F.2d 401, 419 (5th Cir.), cert. denied, 459 U.S. 1036, 103 S.Ct. 448, 74 L.Ed.2d 603 (1982); Arcos Corporation v. American Mutual Liability Ins. Co., 350 F.Supp. 380, 384-85 (E.D.Pa.1972), aff'd, 485 F.2d 678 (3d Cir.1973)