AMERICAN INTERNATIONAL UNDER-
WRITERS CORPORATION, American
Home Assurance Company, and Gran-
ite State Insurance Company, Plain-
tiffs,

v.

ZURN INDUSTRIES, INC., Defendant.

ZURN INDUSTRIES, INC., Plaintiff,

v.

AMERICAN INTERNATIONAL UNDER-
WRITERS CORPORATION, American
Home Assurance Company, and Gran-
ite State Insurance Company, Defen-
dants.

Civ. A. Nos. 89–24 Erie, 89–137 Erie.

United States District Court,
W.D. Pennsylvania.

June 28, 1991.

Jonathan M. Engram, Swift, Currie, McGhee & Hiers, Atlanta, Ga., James T. Marnen, Knox McLaughlin Gornall & Sennett, Erie, Pa., for plaintiffs in Civ. A. No. 89–24 Erie.

Natalie Dwyer Haller, Quinn Gent Buseck & Leemhuis, Inc., Erie, Pa., John C. McIntyre, Jr., Hart & McIntyre, Atlanta, Ga., for defendants in Civ. A. No. 89–24 Erie.

John H. McElhaney, Locke Purnell Rain & Harrell, Dallas, Tex., for plaintiffs in Civ. A. No. 89–137 Erie.

Jonathan M. Engram, Swift, Currie, McGhee & Hiers, Atlanta, Ga., C. Edward Fowler, Jr., Bailey & Williams, Dallas, Tex., for defendants in Civ. A. No. 89–137 Erie.

## MEMORANDUM OPINION

MENCER, District Judge.

By its complaint, Zurn industries seeks to recover funds allegedly owed by several insurers under various excess insurance policies. The insurers, American International Underwriters Corporation (AIU), American Home Assurance Company (American), and Granite State Insurance Company (Granite), (collectively "the Insurers"), have filed their own complaint seeking a declaratory judgment stating that

they are not obligated under the insurance policies to pay Zurn. Jurisdiction is based on diversity of citizenship.[1]

Zurn made the first legal maneuver by instituting a damages action in the U.S. District Court for the Northern District of Texas. *Zurn Industries, Inc. v. American Int'l Underwriters Corporation,* Civil Action No. CA3–89–0342–D, Memorandum Opinion and Order (ND Tx 5/31/89). The insurers then instituted a declaratory judgment action in this court. Next, the Texas District Court transferred Zurn's action here, *Id.,* where it was given the Western District of Pennsylvania Docket Number Civil Action No. 89–137 Erie (We will refer to 89–137 as the "damages action."). By an order of June 28, 1989, we consolidated the damages action with the insurer's declaratory judgment action, Civil Action No. 89–24 Erie, which had been pending in this court. Counterclaims were filed making each case the mirror image of the other, but because the declaratory judgment action had the lower docket number, it became the "lead" case. We find it confusing and inappropriate to proceed on the declaratory judgment when an identical damages action is also pending. Thus, for purposes of today's opinion, as well as all future motions, we will treat the damages action as the "lead" case. Zurn, the party seeking affirmative relief, will be the plaintiff, and the Insurers, the defendants. See, e.g., *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.,* 562 F.2d 365, 368 (6th Cir.1977).

Currently before the court is Zurn's Motion For Partial Summary Judgment, Insurers' Supplemental Motion for Summary Judgment and to Dismiss, Zurn's Motion To Be Designated Plaintiff at Trial, and Zurn's Motion to Compel. We will outline the pertinent facts, discuss choice of law, and then address the substantive issues.

### I. *Factual Background*

This case arises from the damage sustained by the city of Garland, Texas, as a result of the failure of its Duck Creek Wastewater Treatment Plant. More specifically, it arises from the Insurers' refusal to indemnify Zurn for the damages it paid out in settlement of Garland's claims stemming from Zurn's role in the failure. The pertinent facts as set out by Zurn are accepted by the Insurers except where noted. See *Insurer's Brief in Opposition to Summary Judgment* [hereinafter *"I–SJ Brief"*] at 2.

Garland sought to construct a wastewater treatment plant to meet effluent standards of 10 mg/1 BOD [2] and 10 mg/1 TSS,[3] together, the 10/10 effluent requirement. To achieve this, it engaged the URS Company to design and engineer the Duck Creek Wastewater Treatment Plant. Zurn, in turn, built a critical component of the overall system, a carbon adsorption system. ("Carbon Unit").

The Carbon Unit failed in late 1977 or early 1978 when an important part of it, the underdrains,[4] suddenly ruptured. The Carbon Unit could not function without the underdrains and the plant could not function without the Carbon Unit; as a result, the City was unable to meet the 10/10 effluent standard. Because of the failure to meet the standard, the Environmental Protection Agency (EPA) withheld grant funds which had been promised to Garland. Litigation ensued.[5] Garland sought $19,-000,000 (later amended to $25,000,000) in

---

1. Zurn is a Pennsylvania corporation with its principal place of business in Erie, AIU and American are New York corporations principally engaged there, Granite is a New Hampshire corporation with its main office and business in Manchester.

2. Biochemical oxygen demand.

3. Total suspended solids.

4. Underdrains are concrete slabs at the base of carbon silos through which wastewater flowed.

5. Zurn filed a claim in federal district court in Texas seeking to recover $890,000 in extra costs incurred as a result of underdrain repair. Garland counterclaimed. *Zurn Industries, Inc. v. City of Garland,* et al., Civil Action No. CA3–82–1840–G. The district court dismissed for lack of subject matter jurisdiction, and Garland filed the state court action. *City of Garland v. Zurn Industries, Inc., et al.,* Case No. 87–8279–M, 298th Judicial District. The Fifth Circuit later reinstated the federal action, and both suits were pending at the time of the settlement. These are the "underlying actions."

damages from Zurn, URS, and others on two main theories. First, negligence in the plant's overall design, and second, negligence in construction of the Carbon Unit.

Eventually, Garland agreed with Zurn that Zurn was similar to a subcontractor and could not be responsible for any defective design of the overall plant. Zurn's primary liability centered on the damage resulting from the failure of the Carbon Unit it constructed—approximately $5,182,994 in lost interest on the EPA funds. See "City of Garland Wastewater Treatment Plant Damage Summary," *I–SJ Brief* at Exhibit 11. Repair costs incurred by both Zurn and Garland offset each other. After a minitrial/mediation on November 2, 1988, Zurn, Garland and others settled their claims for $5,025,000: $4,975,000 was in compensation for the Carbon Unit failure and $50,000 was to compensate for any possible effect on the design claim. *Zurn's Evidentiary Supplement to its Brief in Support of Its Motion for Partial Summary Judgment* [hereinafter "Motion Exhibit"], Exhibit 22 (Settlement agreement). Zurn's share of the overall settlement was $2,850,000. *Id.* at 12. The URS engineers later settled the design claims for $8,250,000.

According to Zurn, and without opposition from the Insurers, Zurn had the following insurance policies in effect at the relevant times:

(1) A Liberty Mutual Insurance Company ("Liberty") comprehensive general liability policy with a limit of $1,000,000. ("LP1"). Coverage was effective 4/1/77–4/1/78. *Motion Exhibit* 3.

(2) A Liberty excess liability policy of $9,000,000 over $1,000,000, ("LP2"), covering the same period as LP1. *Motion Exhibit* 4.

(3) An American excess liability policy with limits of $5,000,000 in excess of $9,000,000 in excess of $1,000,000. ("American policy"). The American policy was effective 12/17/74–12/17/77. *Motion Exhibit* 5.

(4) A Granite excess liability policy, also for $5,000,000 in excess of $9,000,000 in excess of $1,000,000. ("Granite policy"). The Granite policy was effective 12/17/77–12/17/79. *Motion Exhibit* 6.[6]

Liberty assumed 80% of the litigation expenses of the underlying claims, and then paid $1,068,716 on behalf of Zurn into the settlement. This exhausted Liberty's policy aggregate. *Motion Exhibit* 21. Liberty's payment still left Zurn without reimbursement of $1,752,926 of the settlement amount, and Zurn felt that sum was due from the Insurers. The Insurers refused to contribute to the settlement.

American was aware of the Garland litigation on November 22, 1985 at the latest. *Motion Exhibit* 14. By February 10, 1986, AIU was aware of the litigation and its potential to breach the excess layer of coverage. *Motion Exhibit* 15.[7] Insurers took no action until September, 1988, when they began an investigation into the matter in preparation for the November 2, minitrial/mediation. The Insurers denied coverage and refused to contribute to the settlement on the grounds that "the liability and loss which is the subject of this case, did *not* constitute a covered loss under the terms of the Liberty Policy 1, Liberty Policy 2, the American Policy nor the Granite Policy." *I–SJ Brief* at 3; *Motion Exhibit* 20.

---

6. AIU is a member of an "insurance group," consisting of 15 members including American and Granite. AIU has conducted all communications with Zurn regarding the American and Granite policies, and has made the business decisions for those two companies. *Lund Affidavit*, ¶ 27, *Motion Exhibit*, Carrol Deposition at 94. Zurn argues that AIU is the "alter-ego" of Granite and American and is liable to the extent they are. The insurers have not addressed this point.

Both parties treat all the excess policies as identical, and we see no reason to differentiate among them. Accordingly, we refer to "The Policy" or "Policies" to include all the excess policies listed.

7. The Insurers claim that "Although both Liberty Mutual and Zurn had an obligation to the excess Insurers to advise as to the status of the underlying Texas litigation, not until October 7, 1988, did Liberty Mutual notify the excess insurers that a mediation was to be held in Dallas on November 2, 1988 and that the excess Insurers would need to become actively involved in future settlement discussions." *Brief in Opp.* at 2. The exhibits are not discussed by the Insurers.

## II. *Choice of Law*

### A.

We must determine whether Texas or Pennsylvania law applies to plaintiff's causes of action, first, in order to govern our inquiry into contractual interpretation,[8] and second, in order to rule on The Insurers Motions to Dismiss Zurn's claims based upon Texas statutory law. Count III of Zurn's Amended Complaint which is based on the Texas Business and Consumer code, and count IV, based on Article 21.21 of the Texas Insurance code, will be dismissed since we determine, *infra*, that Pennsylvania law applies.

At the outset, we note that the parties' positions on choice-of-law issues have not been clearly staked out. In fact, they are internally inconsistent. In its Amended Complaint, Zurn bases count I on "the common and statutory law of Texas." Amended Complaint ¶ 20. However, in seeking summary judgment on that count, Zurn discusses Third Circuit Pennsylvania law almost exclusively without noting any choice of law issue, and The Insurers' extensive opposition similarly contains no reference to choice of law. Thus, it appears that the parties would have Pennsylvania law apply. In contrast, Counts III and IV of Zurn's amended complaint are based on Texas statutory law. In its opposition to the Insurers motions to dismiss counts III and IV, Zurn takes the position that "Texas law Applies to Zurn's Claims for Relief." *Zurn's Response to Insurers' Motion to Dismiss Counts III and IV of Zurn's Counterclaim* ("Z–Dis.Opp.") at 2–7; *Zurn Industries, Inc.'s Brief in Response to the Insurers' Supplemental Brief in Support of Their Motions to Dismiss and for Summary Judgment* ("Z–Supp.Opp.") at 4 ("Texas Law [is] the body of law Zurn contends should apply in this case."). For their part, The Insurers employ choice of law principles to vigorously argue for application of Pennsylvania law in their own motions to dismiss counts III and IV.

In diversity cases, a federal court must apply the choice of law principles of the forum state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1308 (3d Cir.1978). In Docket number 89–137 Erie then, we look to Pennsylvania conflicts rules. Docket number 89–24 Erie, however, was transferred to our court on defendants motion under 28 USC § 1404(a) and we must, therefore, look to the choice of law rules of the transferor forum, Texas. *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *Ferens v. Deere & Co.*, 862 F.2d 31, 34 (3d Cir. 1988), *rev'd on other grounds*, 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990). We would be faced with a difficult question indeed, if we found that different law would be applied to the respective actions. Thankfully, Texas and Pennsylvania choice of law rules both indicate that Pennsylvania law should apply.

### B.

The conflicts methodology of Texas and Pennsylvania are quite similar, and both states, of course, seek to protect the legitimate expectations of the contracting parties. Restatement (Second) of Conflict of Laws [hereinafter Restatement] § 6(2)(d), (f) (1971). Pennsylvania's conflicts law is an amalgam of the "significant relationship" test as stated in the Restatement § 188, and 'interest analysis' which evaluates the effect of the choice of law on the policy interests of the rival jurisdictions. *Compagnie des Bauxites v. Argonaut–Midwest Ins.*, 880 F.2d 685, 688–89 (3d Cir. 1989); *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964); *Melville*, 584 F.2d 1306, 1311. Texas choice of law is based solely on the "significant relationship" test of the Restatement—nominally the same test as the first prong of Pennsylvania's analysis. It is apparent, however, that those concerns of policy evaluated under Pennsylvania's second prong, are sub-

---

**8.** We have not engaged in a comparison of the contract-interpretation rules of Texas and Pennsylvania, but even if they were identical, we still must decide whether to dismiss the Texas statutory causes of action.

sumed into the Texas "significant relationship" test. *Gulf Consol. Services v. Corinth Pipeworks, SA*, 898 F.2d 1071, 1075 (5th Cir.1990); *Atlantic Mutual Ins. Co. v. Truck Ins. Exchange*, 797 F.2d 1288, 1291 (5th Cir.1986); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984).[9]

■ Under both Texas and Pennsylvania law then, we must group the various relevant contacts in an effort to determine which jurisdiction has the most significant relationship with the parties and the occurrence. *Griffith*, 203 A.2d at 802. "Contacts considered vital in determining the state of most significant relationship include place of injury, place of conduct, domicile of the parties, and the place where the relationship between the parties is centered." *Id.* In the words of the Restatement, we consider (a) the place of contracting, (b) the place of the contract's negotiation, (c) the place of performance, (d) the location of the subject matter of the contract, (e) the domicil, residence, nationality, state of incorporation, or place of business of the parties. *Argonout*, 880 F.2d at 689; *Uniwest Mort. Co. v. Dadecor Condominiums, Inc.*, 877 F.2d 431, 435 (5th Cir.1989); *DeSantis*, 793 S.W.2d at 678–79 and n. 2.

■ Pennsylvania has the larger number of contacts with the matters at hand. Zurn is incorporated there and has its principle place of business there, the policy was delivered there, premiums were paid from there, the policies were countersigned by Zurn's insurance agent, Lee Cabelof, in Pennsylvania, *Motion Exhibits* 3 at 1, 4 at 1, the contract was negotiated between Pennsylvania and New York, and the place of performance (the payment of the benefits) is Erie Pennsylvania. The only contact Texas has, though it is an important one, is that the insured risk, the risk of a lawsuit and liability, was located there. The raw total of contacts, of course, is not determinative; we must undertake a qualitative evaluation of the contacts as well. *Corinth*, 898 F.2d at 1075; *Argonaut*, 880 F.2d at 690.

Although the sole contact with Texas is that it is the situs of the risk, under The Restatement's specialized insurance rules, the location of the insured risk is an important factor indeed. Restatement § 193 provides that the rights under an insurance contract "are determined by the local of the state which the parties understood was to be the principal location of the insure risk ... unless with respect to the particular issue, some other state has a more significant relationship under ... § 6." Restatement at § 193. "By its terms, however, § 193 is limited to cases in which there is an understanding among the parties as to the location of the insured risk," *Argonaut*, 880 F.2d at 690, and Zurn has not even alleged that such an understanding existed.

Zurn argues that because it is a "corporation licensed to do business in all 50 states, it never contemplated that the risks covered by the policies at issue were located primarily or solely in Pennsylvania." *Z–Dis.Opp.* at 5–6. Nowhere does it genuinely allege, however, that the parties actually intended *Texas* to be the principal location of the insured risks under the policies here. See *Argonaut*, 880 F.2d at 690. In fact, the Insurers point out that the underwriting file reflected "no significant insured location or risk located in Texas." *Insurers Reply Brief in Response to Zurn's Brief in Opposition to the Insurers' Motion to Dismiss* ["I–Dis.Rep."] at 3. Even if present, an awareness on the part of both parties that "Zurn was conducting significant business operation in Texas," *Z–Dis.Opp.* at 6, is not a sufficient "understanding" to bring the contract within the ambit of § 193.

Moreover, there were many risks of many lawsuits scattered throughout many states which were insured by these policies,

**9.** In fact, the Texas rule is sometimes expressed as pointing to the state with the "most significant relationship to the *particular substantive issue*," *Atlantic Mutual*, 797 F.2d at 1288; *Corinth*, 898 F.2d at 1074, rather than the "most significant relationship to the *transaction and*

*the parties....*" Restatement § 188(1). In its most recent reference, however, the Supreme Court stated the rule as set forth in the Restatement. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex.1990).

and if we were to accept Zurn's contention, it would amount to holding that the parties intended to have a different state's law apply to each risk. This would be such an unnecessary burden that the Restatement itself provides that "the location of the risk has less significance ... where the policy covers a group of risks that are scattered throughout two or more states." Restatement § 193 comment (b). See *American Home Assurance Co. v. Libbey-Owens-Ford Co.*, 588 F.Supp. 764, 765–66 (D.Mass. 1984), *rev'd on other grounds, American Home Assurance Co. v. Libbey-Owens-Ford Co.*, 786 F.2d 22 (1st Cir.1985).

The real relationship at issue here is the Zurn/Insurer relationship. In fact, that is exactly why Judge Fitzwater transferred the case here in the first instance. *Zurn Industries, Inc. v. American Int'l Underwriters Corporation*, Civil Action No. CA3-89-0342-D, Memorandum Opinion and Order at 6–9 (ND Tx 5/31/89). It may be, as Zurn alleges, that the documents and evidence surrounding the underlying claim of Garland are all located in Texas; that however, only points up the error of Zurn's contention. The documents more relevant to this case are those which spell out the relationship between Zurn and the Insurers, and those, of course, are more closely connected with Pennsylvania. Zurn "urges this Court to look to the state contacts with the underlying suit.... The determination of [Zurn's] claim, however, turns upon the interpretation of the insurance policies," *Atlantic Mutual*, 797 F.2d at 1292, not the underlying suit.

### C.

We now turn to the policy concerns raised by the choice of law question, and we need not detain ourselves long on these matters. Certainly, Texas has an interest in seeing that companies which are found liable under its laws (Zurn) are able to pay any penalty which might be levied, and that those who undertake to insure such companies (Insurers) do not leave any judgment effectively "uncollectible." However, under similar facts, the Fifth Circuit conclud- ed that where a single jurisdiction encompasses the insured's location, the place of negotiation of the insurance contract and the place where the insurance obligations will be performed, it has a stronger interest in the substantive issues surrounding the legality of the insurance provisions themselves, than does the jurisdiction with the situs of the risk. *Atlantic Mutual*, 797 F.2d at 1292. Plainly, it is not Texas that has concern with deceptive trade practices occurring in Pennsylvania. Texas law will necessarily govern whether or not Zurn must pay damages in the underlying suit, but there can be no doubt that Pennsylvania must be able to confidently regulate the sale of insurance within its borders to its residents without interference from sister states.

In sum, we hold that Pennsylvania law applies to the case at bar, and our order will, therefore, dismiss counts III and IV of Zurn's complaint. We proceed to the remaining claims below.

### III. *Coverage Under The Policy*

#### A. Standards

Currently before us are cross-motions for summary judgment. The Insurers filed their motion for summary judgment on December 5, 1990, but after Zurn amended its complaint in February 19, 1991, the Insurers filed a "Supplemental Motion for Summary Judgment and Motion to Dismiss Zurn's Complaint and Counterclaim as Amended" on March 25, 1991. The Insurers seek to squelch each count, either by dismissal or summary judgment. Zurn, on the other hand, has moved only for partial summary judgment; it seeks judgment in its favor on Count I of the Amended Complaint, the count which alleges breach of contract by the Insurers. Count V of the Amended Complaint is "simply a broader notice pleading breach of contract count," *Brief in Support of Motion for Leave to Amend* at 2, and thus even though Zurn has not amended its Partial Summary Judgment Motion to encompass count V, we conclude that Zurn is requesting summary judgment as to counts I and V.[10]

---

**10.** As we have noted, Counts III and IV will be dismissed on choice of law grounds. Counts II

Rule 56(c) of the Federal Rules of Civil Procedure provides that if "there is no genuine issue as to any material fact, ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The rule is designed to protect potential defendants from having to litigate frivolous claims, and therefore, not just any factual dispute will preclude summary judgment; the factual dispute must be about a material element of the cause of action. Moreover, the simple assertion of a factual dispute—even about a material element—will not preclude summary judgment. The non-movant must supply something more than mere speculation or conjecture in order to avoid entry of judgment against it. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2727.

"The burden on the moving party is to show that there is an absence of evidence to support the nonmoving party's case." *Peters Tp. School Dist. v. Hartford Accident & Indemnity Co.,* 833 F.2d 32, 34 (3d Cir.1987). Once the moving party does so, then the non-moving party may successfully controvert it only by supplying some actual evidence or the real promise of actual evidence at trial. Of course the non-movant need not produce a large quantum of evidence; it need not obtain summary judgment in its own favor in order to avoid summary judgment against it. Still, the requirement for actual evidence is a real one; the non-movant "must adduce more than a mere scintilla of evidence in its favor." *Carlson v. Arnot–Ogden Memorial Hospital,* 918 F.2d 411, 413 (3d Cir. 1990). Although we must view any evidence in the light most favorable to the non-moving party, *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983), that party still bears the burden of showing us that at trial it could proffer sufficient evidence to allow the fact-finder to believe in the "existence of [every] element essential to that party's case...." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273 (1986). "On cross-motions for summary judgment the same standards would apply." *Peters Tp.,* 833 F.2d at 34.

Summary judgment is particularly appropriate on counts I and V, because there is no genuine dispute as to any of the important underlying facts. See *Insurer's Brief in Opposition to SJ* at 2. Although the parties disagree as to the interpretation of the insurance policy, "[d]etermination of the proper coverage of an insurance contract when the underlying facts are not in dispute is a question of law." *Niagara Fire Ins. v. Pepicelli, et al. & Youngs,* 821 F.2d 216, 219 (3d Cir.1987). The following "well-settled principles" of Pennsylvania insurance law guide our inquiry:

> [I]f the language of an insurance policy is clear and unambiguous, its ordinary meaning is to be given effect; policy terms should be read to avoid ambiguities; a provision is ambiguous if reasonable persons on considering it in the context of the entire policy could honestly differ as to its meaning; if ambiguities do exist in the wording chosen by the insurance company, they must be resolved in favor of the insured; a court cannot rewrite the terms of a policy or give them a construction in conflict with the accepted and plain meaning of the language of the policy.

*Imperial,* 858 F.2d at 131 (citations omitted). "The goal of [the interpretive] task is, of course, to ascertain the intent of the

---

and VI are quite similar, alleging, respectively, a bad faith breach of a duty of good faith and fair dealing, and a bad faith breach of fiduciary duty. These counts will, according to Zurn, require a trial. We disagree, however, and grant summary judgment in favor of The Insurers on these counts below.

The insurers specifically address counts I and V in their summary judgment briefs, and counts III–IV in their Briefs on dismissal. In a supplemental brief, they address Count VI. *Supplemental Brief in Support of the Insurers Motion for Summary Judgment and Motion to Dismiss Zurn's Complaint and Counterclaim, as Amended* [hereinafter "I–Dis.Supp."] 5–10. Although they nowhere specifically mention count II, presumably their arguments apply to that count as well. We address the bad faith claim in section IV below.

parties as manifested by the language of the written instrument." *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566 (1983). In our "attempt[ ] to arrive at a reasonable construction of the policy that is in accord with the parties' apparent intention, [we] may look to extrinsic evidence of the purpose of the insurance, its subject matter, the situation of the parties, and the circumstances surrounding the making of the contract." *Pacific Indemnity Co. v. Linn*, 766 F.2d 754, 761 (3d Cir.1985).

The first major interpretive question, is whether the underdrain failure yielded any property damage or physical injury covered under The Policy. In addition to challenging that any compensable property damage occurred under the definitional terms of the Policy, the insurers allege that the loss of EPA grant money is not a compensable loss, and that the settlement was improperly apportioned. We deal with each claim in turn. We will address the basic coverage issue first.

### B. Insured Product Exclusion

#### 1. *Generally*

■ The Policy provides, in relevant part, that "the company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence...." *Motion Exhibit* 3, LP1 at 1, *Motion Exhibit* 4, LP2 at 1.

"property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

*Motion Exhibit* 3, LP1 at 3; *Motion Exhibit* 4, LP2 at 3.[11] These definitions would appear to encompass the physical damage to the underdrains. Both parties agree, however, that the damage to the underdrains themselves is not compensable under the Policy because the underdrains are the insured's own product, and any damage to them is excluded under what is known as an "insured product exclusion." Instead, the dispute centers around what other items are or are not the "insured's product." Specifically, the Policy denies compensation for

(m) [ ] loss of use of tangible property which has not been physically injured or destroyed resulting from ... (2) *the failure of the named insured's products ... to meet the level of performance, quality, fitness or durability warranted or represented by the named insured.*

*Motion Exhibit* 3, LP1 at 2; *see also Motion Exhibit* 4, LP2 at 1. The Insurers quote only this part of the "insured product exclusion." Zurn, however, points to the remainder which we call the "m-exception" to the "insured product exclusion," and it states that the "insured product exclusion"

does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products ... after such products ... have been put to use by any person or organization other than an insured[.]

*Motion Exhibit* 3, LP 1 at 2; *see also Motion Exhibit* 4, LP 2 at 1.

The Insurers argue that the damage to the plant is not covered because it was merely consequential damages resulting from the insured's product's failure to perform as expected. The policy, they point out, only covers consequential damages flowing from "property damage to which this insurance applies"; in other words, the policy covers only consequential damages to the extent that they arise out of situations otherwise covered. "[T]herefore, con-

---

11. "[O]ccurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured[.] *Motion Exhibit* 3, LP1 at 3;

*Motion Exhibit* 4, LP2 at 3. Mr. Carroll, a claims examiner for AIU, acknowledged that the rupture of the underdrains was an occurrence, *Motion Exhibit* "Carroll" at 40, and so we may turn immediately to the question of property damage.

sequential damages arising from the insured's own product, property explicitly excluded from the policy's application [by the "insured product exclusion"], would not be covered." *American Home Assurance Co. v. Libbey–Owens–Ford Co.*, 786 F.2d 22, 27 (1st Cir.1985) ["LOF"]. The insurers' contended that any injury to the plant was due to the mere failure of the insured's product, the carbon system, to "meet the level of performance" expected of it.

Zurn views the matter differently. It argues that through incorporation of the drain into the plant, the drain's failure is damage to the plant itself, and is, therefore, compensable as damage to property other than the insured's. In *Imperial Casualty and Indemnity Co. v. High Concrete Structures, Inc.*, 858 F.2d 128 (3d Cir.1988), the insured supplied defective metal which was made into washers. The Third Circuit held the "insured product exclusion" did not apply because the defective washers *themselves* became "property other than the insured's" after they were fabricated from the sheets. Thus, the damage to the washers was damage to property other than the insured's.

We must draw a line somewhere between the insured's product's failure *causing damage* to another product, and its *being* damage to a part of a new larger product. In the former, because there is no coverage for the insured's product, there is no coverage for the consequential damages flowing therefrom. In the latter, since the damaged property is *not* the insured's product, the damage is compensable. The distinction is also related to the definition of "property damage" in the main body of the Policy. If the underdrains were 'part of' the plant, then their failure would constitute "property damage" as "physical injury." LP1 at 3; LP2 at 3. If the underdrains were not the same entity as the plant, then the requirement of "property damage" could be met only by the second definition dealing with "loss of use of tangible property not physically injured." *Id.*

On this matter, we agree with the Insurers; the failure may have caused damage to the plant, but it certainly was not damage to the plant in itself. The purpose of the exclusion is to

> exclude from coverage the ordinary contractual risk that a product will fail to live up to contract demands and will require repair or replacement ... A general liability policy is not deigned to act as insurance for these ordinary contract failures, but rather to protect the insured in the event the insured's product causes damage to other property or persons.

*LOF*, 786 F.2d at 28. A potential circularity is immediately apparent, however, in that anytime a business purchases anything, it will likely be used in conjunction with something else. Thus, if the exclusion is to mean anything, its definition cannot allow circumvention by simply saying that the insured's product was part of a larger picture, the total utility of which is lessened by the damage to the insured's product itself. The insured's product will almost always be part of a larger picture.

We believe that the distinction between being damage and causing damage lies in the amplitude of the insured's product's metamorphosis. Here, The carbon system remained sufficiently distinct from the entire plant that it did not "become" the plant. By contrast, The steel itself in *Imperial* took on a new and inseparable identity and became washers. If the insured's product keeps its own function and identity, then its failure is its own and the consequential damages flowing therefrom are just that. The case at bar is closer to *McDowell–Wellman Engineering Co. v. Hartford Accident and Indemnity Co.*, 711 F.2d 521 (3d Cir.1983), in which the failure of the insured's product—an ore bridge—rendered an entire plant inoperable, but the court held that any damage was *to the bridge* and not *to the plant* itself. See also *Puritan Ins. Co. v. Aldan Rubber Co.*, 866 F.2d 648, 649 (3d Cir.1989) (notwithstanding the extensive analysis of the meaning of "damage" in *Imperial,* apparently deemphasizing that case on the grounds that physical damage was "conceded"). The difference between *Imperial*

on the one hand and *McDowell–Wellman* on the other, is that in the former there was no "steel" after the occurrence, and in the latter there certainly was a plant left, albeit one without any accessibility.

Our task is to determine whether "the purchaser [of the insured product] created a new product having a value in excess of the value of the product supplied by the insured, and suffered damage to more than just the insured's product." *Imperial,* 858 F.2d at 134. The question is not whether the product was *employed* in a larger operation but whether it was *"made into* something else." *Id.* at 135. Under this test, the "insured product exclusion" would appear to bar recovery here. Since the carbon unit remained a distinguishable and separable part of the plant, it was not "made into" the plant, and its failure thus caused consequential damage to the plant.

### 2. *Exception to the Insured Product Exclusion*

The insured product exclusion, however, will not defeat recovery here because the "m-exception" to the exclusion is operable. We need not detain ourselves long on this matter because the meaning of that exception is very plain. It states that "[t]he [insured product] exclusion does not apply to loss of use of tangible property resulting from the sudden and accidental destruction of the named insured's products ... after such products have been put to use by any person or organization other than the insured." The carbon system was purchased and "put to use" by Garland; Garland is not the Insured. The product failed after it was put to use by Garland. *Carnes Affidavit* at ¶¶ 7–8 and Exhibits C–D (Zurn regional manager). The plant is tangible property. Garland suffered a loss of use of the plant. The plant became inoperable as direct result of the "accidental or sudden destruction of the named insured's

product[,]" the underdrain failure in Zurn's carbon unit. In sum, by the plain and unambiguous language of the "m-exception," the "insured product exclusion" does not defeat coverage in the case at bar.[12]

Next, we address the main body of The Policy. It provides that "the company will pay on behalf of the insured all sums which the insured shall become legally obligate to pay as damages because of ... property damage to which this insurance applies...." *Motion Exhibit* 3, LP1 at 1, *Motion Exhibit* 4, LP2 at 1. The damage here, we earlier determined, does not qualify as "property damage" under the first definition: "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom." *Id.* Rather, it qualifies as "property damage" under the second definition, namely "(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." *Id.* As Insurers pointed out, however, simply being property damage was not sufficient. Because of the "insured product exception," they continued, the "property damage" claimed by Zurn was not "property damage *to which this insurance applies."* *Insurer's Brief in Opposition to Zurn's Motion for SJ* at 5 (emphasis in original). Now, however, we have ruled that the "insured product exclusion" is inapplicable, and thus it is apparent that the damage to the plant *is* "property damage to which this insurance applies." *Motion Exhibit* 3, LP1 at 1, *Motion Exhibit* 4, LP2 at 1. Any amount properly paid by Zurn in settlement then, is a "sum which the insured [has] become legally obligated to pay as damages because of ... property damage to which this insurance

---

**12.** Zurn's count V seems to do nothing more than reallege its count II. The Insurers, however, have pieced together an extensive and specific opposition to count V. Insurers argue that "Zurn contends that a 'Special Coverage Endorsement,' Endorsement No. 3 to Liberty Policy 1, provides...." *I–Dis.Supp.* at 2. The court, however, has found no reference to that endorsement in any of Zurn's papers except Zurn's

response to the Insurers argument. We see nothing different in Count V than in count I. Compare Amended Complaint paragraphs 16 with 49, 17 with 50, and 19 with 51. In any event, the argument over endorsement no. 3 goes to the "insured product exclusion," and it is irrelevant since we have decided that coverage is available under the "m-exception" to that exclusion.

applies...." Id. Unless the settlement is somehow unacceptable, the Insurers must compensate for it. The Insurers have indeed attacked the settlement, and we address that challenge below.

### C. The Settlement

■ The primary source of damage to Garland was the loss of use of EPA grant funds due to the failure of the Duck Creek plant to meet EPA effluent standards. Apparently, Garland eventually obtained these funds, but for the period the funds were unattainable Garland felt damage in the form of lost interest on the money. The primary portion of Zurn's settlement with Garland was designed to compensate Garland for that lost interest. Insurers argue that lost interest is too speculative a damage to be covered under the Policy, *Brief in Support of Insurers' Motion for Summary Judgment* at 7–8, but we do not agree. The loss here is a clear, direct and identifiable loss neatly traceable to the failure of the underdrains and the Duck Creek plant. See *Aetna Cas. & Sur. Co. v. General Time Corp.*, 704 F.2d 80, 82–83 (2d Cir.1983). Furthermore, this issue is the result of an ambiguity in the contract, and thus it is to be resolved in favor of the insured. See § III(A), *supra.*

Insurers must indemnify for "all sums which the insured [has] become legally obligated to pay," and whether lost profits would be legally recoverable by Garland is, of course, a matter of Texas law. Neither side, however, has addressed Texas law specifically, and we need not conduct a mini-trial as to whether lost interest was a perfect measure of damages. Rather, in determining whether this settlement would require the Insurers to reimburse Zurn, we need only satisfy ourselves that the negotiations were "done in good faith and the settlement was fair and reasonable." *Alfiero v. Burks Mut. Leasing Co.*, 347 Pa.Super. 86, 500 A.2d 169, 172 (1985); *Luria Bros. & Co. v. Alliance Assur. Co. Ltd.*, 780 F.2d 1082 (2d Cir.1986). This is especially true here, since The Insurers dawdled for so long on this matter. The Insurers took no action to assess Zurn's liability for two and one-half years after they were on notice that the excess insurance layer might be pierced, *Motion Exhibit* 14 (letter of Coroon & Black to American Home dated 11/22/85); *Motion Exhibit* 15 (letter of Coroon & Black to AIU dated 2/10/86) and over four years after the Insurance Agent, Coroon & Black, was informed of the underlying Garland litigation. *Motion Exhibit* 13 (letter of Zurn to Coroon & Black dated 6/11/84); see also note 6, supra. Zurn would often entreat the insurers to join in the settlement processes, but to no avail. In the well supported words of Zurn, "[a]lthough afforded *years* to reserve their rights to deny coverage and to resolve any coverage issues well in advance of the ultimate settlement, the Insurers refused to contribute toward the settlement and did not file the instant declaratory judgment action until after the settlement was agreed upon by the parties in the Garland litigation." *Zurn's Reply Brief in Support of Motion for Summary Judgment* at 15.

■ The Insurers argue that their torpidity does not *estop* them from challenging the settlement, and they might very well be correct that it does not. We need not decide that issue, however, because under the proper standards, the settlement withstands the Insurers challenge regardless of estoppel. Whether or not the Insurers ought to actually be estopped from even challenging the settlement is an entirely different inquiry from the standards which would govern the proffered challenge. As noted earlier, the Insurers failure to join in the settlement proceedings and their refusal to indemnify Zurn does have the effect of relaxing judicial scrutiny of the settlement, limiting it to a search for reasonableness.

"When an insurer declines coverage, as here, an insured may settle rather than proceed to trial to determine its legal liability. In order to recover the amount of the settlement from the insurer, the insured need not establish actual liability to the party with whom it has settled so long as a potential liability on the facts known to the insured is shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible

recovery and degree of probability of claimant's success against the insured." *Luria Bros.*, 780 F.2d at 1091 (citations omitted). Thus, when an insurer declines coverage and refuses to negotiate on the grounds that the matter is not covered by the policy, it does so at its own peril. If it turns out, as it did here, that the insurer is obligated to indemnify for the incidents in question, the insurer must accept the apportionment arrived at in the negotiations it rebuffed. Such a rule is eminently prudent and practical, for without it, settlement would be difficult. Especially among several parties with potential liability, one misguided party's refusal to join in the negotiations could thwart an equitable settlement that pleases all other parties.

■ The Insurers claim that the settlement here was inequitable because it apportioned too much damage to the underdrain failure for which it must indemnify vis-a-vis the design defect claim for which it need not. This contention is meritless and warrants only limited attention. As noted earlier, Garland's claims were of two types. The "process design" claim, which alleged that the design of the entire plant was negligently selected, and the claim stemming from the failure of the underdrains and the Carbon Unit. See *I–SJ Opp.* at 4; *Affidavit of Lund* at ¶¶ 11–13 (senior vice-president of Zurn). The settlement agreement attributed 99% of the $2,850,000 payment for loss of use of the plant due to underdrain claims. The Insurers claim that this was unreasonable in light of the fact that "this category of damages constituted less than nineteen percent (19%) of Garland's total claimed damages against Zurn." *I–Opp. SJ* at 12. Insurers claim that Zurn simply apportioned this settlement "to one category of claimed damages [, the Underdrain Claims,] where Zurn felt its best chance existed for coverage." *Id.* at 16. See *Motion Exhibit 22* at 12 (settlement agreement).

Zurn disagrees, arguing that Garland merely employed a "shotgun" approach in its pleadings alleging that all $19,000,000 (later amended to $25,000,000) in losses were caused by all parties. *Motion Exhib-it* 59 at (Garland's Counterclaims and Crossclaims). After some time, however, it became clear that Zurn would be chiefly responsible for the underdrain failure, but would face little liability for any faulty overall design. URS Company, the design engineer for the project would face that. It makes perfect sense then, that 99% of the damage for which Zurn was responsible was the primary underdrain damage—lost interest.

Insurers claim that the settlement was malapportioned, but they offer no more than the difference between what was sought in the complaint and what was actually settled for, in support of their claim. Merely because Garland *alleged* that Zurn was *also* responsible for the process design claim is no evidence of an improper settlement. In fact, given the Insurers' claim that Zurn faced serious liability on the process claims, one would have expected The Insurers to triumph in avoiding any liability for it. The scenario outlined by Zurn—broad pleading—not only comports with standard legal practice, but it is also the only scenario actually supported by genuine evidence. See *Lund Affadavit; Motion Exhibit* 22. Furthermore, we doubt whether under any circumstances a simple disparity between the complaint and the settlement would be sufficient to disturb a settlement, but here especially, the terms do not appear to be at all inequitable. Taking into account the amount sought, the amount settled for, Zurn's limited role in the overall design of plant, and Zurn's primary responsibility for the underdrain rupture, we believe that Insurers have not raised a genuine issue as to the reasonableness of the settlement. To the extent that the settlement is not to the Insurers fancy, we remind them that they had ample opportunity to participate in its negotiation.

We hold, then, that the Insurers are bound by the terms of the policies at issue to indemnify Zurn for the amounts paid in settlement of the underlying claims. Zurn is entitled to summary judgment on counts I and V of its complaint. Zurn has represented the amount paid out in settlement as $1,781,284.00. *Amended Complaint* at

¶ 16.[13] The Insurers have not attacked the veracity of that demand and thus we feel confident in entering judgment in that amount.

## IV. *Bad Faith*

 So far, we have determined that counts III and IV of the complaint should be dismissed, and that judgment should be entered in favor of Zurn on counts I and V. Counts II and VI seek recovery on the basis of the Insurers' bad faith and attorney's fees and costs. These counts are challenged in the Insurers' Motion for Summary Judgment (12/5/90) and their Supplemental Motion for Summary Judgment and to Dismiss Zurn's Complaint and Counterclaim (3/25/91). Each count is virtually indistinguishable from the other and, accordingly, we treat them jointly.

Before a recent legislative initiative, Pennsylvania recognized no cause of action for insurers' bad faith dealings with their insureds. Such a cause of action was explicitly rejected in the companion cases of *D'Ambrosio v. PA Nat'l Mutual Casualty Ins. Co.*, 494 Pa. 501, 431 A.2d 966 (1981) and *Smith v. Harleysville Ins. Co.*, 494 Pa. 515, 431 A.2d 974 (1981); cf. *Pekular v. Eich*, 355 Pa.Super. 276, 513 A.2d 427 (1986); *Hardy v. Pennock Insurance Agency, Inc.*, 365 Pa.Super. 206, 529 A.2d 471 (1987). In February 1990, however, Pennsylvania established a statutory cause of action for such conduct, providing for punitive damages, interest, attorney fees and costs as well as prejudgment interest. 42 PaCS § 8371 (1990). Section 8371 became effective on July 1, 1990, Act 1990–6, February 7, 1990 § 32(8); see *Williams v. State Farm Mutual Auto. Ins. Co.*, 763 F.Supp. 121, at n. 7 (E.D.Pa.1991), and it does not apply to actions taken before its effective date. *Liberty Mutual Insurance Co. v. Paper Manufacturing Co.*, 753 F.Supp. 156 (E.D.Pa.1990); *McAlister v. Sentry Insurance Company*, 1991 WL 102973, Civ. A. No. 91–1701 (E.D.Pa. 6/1/91). Since Insurers' refusal to indemnify necessarily occurred before January, 1989 (the date of the settlement), it would appear to fall outside the purview of the new cause of action.

Zurn asks us to hold that Insurers' refusal to indemnify is a "continuing" violation consisting of successive daily bad faith denials, and that as such, each of The Insurers' 'nonpayments' is an action occurring after the section's effective date which ought to give rise to liability even with a purely prospective application. Such a construction has been sagaciously rejected by all the legal authority that has considered it, see, e.g., *Bryant v. Liberty Mutual Ins. Co.*, 1990 WL 223126, Civ. A. No. 90–5637 (E.D.Pa. 12/20/90); *Wazlawick v. Allstate Insurance Co.*, 1990 WL 294273, Civ.A. No. 90–3329 (9/28/90); cf. *Paper Mf'g*, 753 F.Supp. at 160 (declining to dismiss a claim based on such a theory only because it was unopposed), and we decline Zurn's invitation to forge a new path. Such a construction would obviously require insurance companies to reopen all claim files which had been denied prior to July 1990. Not only would that effect be costly, burdensome, and without advantage, but it would also be inconsistent with the repose sought to be protected by prospective application.[14] Given the unassailable conclusion that the section is not retroactive, it would be internally inconsistent, as well as bad policy, to construe the statute as suggested by Zurn. Accordingly, we will grant the motion of the Insurers as to counts II and VI.

An appropriate order will issue.

---

**13.** Zurn seeks $1,752,926.00 in its "wherefore clause" in Count I, and $1,781,284.00 in count V. Since count V was added later, we treat its demand as determinative of the amount sought by Zurn.

**14.** The *Wazlawick* court reasoned that this situation may be analogized to the tolling of a statute of limitations for a breach of contract action. As has long been held by Pennsylvania courts, the tolling of the statute begins at the time of the initial breach, whether or not the breach continues throughout the trial. See, e.g., *Baird v. Marley Co.*, 537 F.Supp. 156, 157 (E.D.Pa.1982), citing *In re Dixon Estates*, 233 A.2d 242, 426 Pa. 561 (1967). Therefore, we find that the denial of coverage is the action which determines whether Pa.C.S.A. § 8371 may apply in this case. Since the effective date of the statute is after [the insurers'] action, 42 Pa.C.S.A. § 8371 does not apply....

## ORDER

AND NOW, this 28th day of June, 1991, for the reasons set forth in the accompanying memorandum opinion,

IT IS HEREBY ORDERED THAT:

(1) The motion of plaintiff, ŻURN INDUSTRIES, for Partial Summary Judgment is GRANTED. Judgment is entered in favor of plaintiff, ZURN INDUSTRIES, INC. and against defendants AMERICAN INTERNATIONAL UNDERWRITERS CORPORATION, AMERICAN HOME ASSURANCE COMPANY, and GRANITE STATE INSURANCE COMPANY, on Counts I and V of Zurn's Amended Complaint and Counts I and V of Zurn's Amended Counterclaim, in the amount of 1,781,284.00 (One–Million Seven–Hundred and Eighty–One–Thousand, Two–Hundred and Eighty–Four) Dollars plus post judgment interest in the amount of 6.39% per annum.

(2) Defendants, AMERICAN INTERNATIONAL UNDERWRITERS CORPORATION, AMERICAN HOME ASSURANCE COMPANY, and GRANITE STATE INSURANCE COMPANY's, Motion for Summary Judgment, Motion to Dismiss Counts III & IV of Zurn's Counterclaim, and Supplemental Motion for Summary Judgment and To Dismiss Zurn's Amended Complaint and Counterclaim are GRANTED in part and DENIED in part.

(A) Said Motions are GRANTED as to Counts II, III, IV and VI of Zurn's Amended Complaint and Counts II, III, IV and VI of Zurn's Amended Counterclaim. Said Motions are DENIED as to Counts I and V of Zurn's Amended Complaint and Counts I and V of Zurn's Amended Counterclaim. Judgment is entered in favor of Defendants AMERICAN INTERNATIONAL UNDERWRITERS CORPORATION, AMERICAN HOME ASSURANCE COMPANY, and GRANITE STATE INSURANCE COMPANY, and against, Plaintiff, ZURN INDUSTRIES, INC., on Counts II, III, IV and VI of Zurn's Amended Complaint and Counts II, III, IV and VI of Zurn's Amended Counterclaim.

(B) Said Motions are DENIED as to the Complaint of Plaintiffs AMERICAN INTERNATIONAL UNDERWRITERS CORPORATION, AMERICAN HOME ASSURANCE COMPANY, and GRANITE STATE INSURANCE COMPANY for Declaratory Judgment. Plaintiffs AMERICAN INTERNATIONAL UNDERWRITERS CORPORATION, AMERICAN HOME ASSURANCE COMPANY, and GRANITE STATE INSURANCE COMPANY's Complaint for Declaratory Judgment is DISMISSED, *sua sponte.*

(3) Defendants AMERICAN INTERNATIONAL UNDERWRITERS CORPORATION, AMERICAN HOME ASSURANCE COMPANY, and GRANITE STATE INSURANCE COMPANY's, Motion For A Separate Trial on the Issues of Bad Faith and Damages is DENIED as MOOT.

(4) The Motion of Plaintiff, ZURN INDUSTRIES, INC., To Be Designated as Plaintiff at Trial, and the Motion of Plaintiff, ZURN INDUSTRIES, INC., to Compel are DENIED as MOOT.